## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 25 2016, 5:44 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Anthony Holton
Reminger Co., LPA
Indianapolis, Indiana

Noah L. Gambill
Wagner Crawford & Gambill
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

A.H. & W.H. (Minor Children)

and

C.H. (Mother) & R.H. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 25, 2016

Court of Appeals Case No.
84A01-1505-JT-492

Appeal from the Vigo Circuit Court

The Honorable David R. Bolk, Judge

The Honorable Daniel W. Kelly, Magistrate

Trial Court Cause No.
84C01-1406-JT-657 & 84C01-1406-JT-658

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondents, C.H. (Mother) and R.H. (Father) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their minor children, A.H. and W.H. (collectively, Children).

We affirm.

## ISSUE

Parents raise several issues on appeal, which we restate as: Whether there was sufficient evidence to support the termination of their parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the biological parents of A.H., born May 8, 2001, and W.H., born December 4, 2002. On February 28 and 29, 2012, the Department of Child Services of Vigo County (DCS) received reports of neglect against Parents. The report alleged that Father's adult niece (Cousin) had beaten A.H.; Children exhibited poor hygiene; Children had excessive school absences; and Parents' home was unsanitary. On April 26, 2012, DCS entered into an Informal Adjustment with Parents for a period of six months. Between May and November 2012, DCS visited Parents' home. DCS found Parents' home unsanitary; there was trash, cat feces, and urine all over the house. Father's sister (Aunt), who lived in the Parents' home, had punched W.H. in the face with a closed fist and shoved a hotdog in his throat. Pursuant to the

adjustment, Parents were required to attend parenting classes, and were not to allow Aunt, Cousin, and D.C., another adult male residing with Parents, around Children without supervision. By December 2012, Parents had not yet started attending the parenting classes. Father denied that Aunt, Cousin, and D.C. lived in the home; however, each time DCS visited, all three were present.

[5] On January 3, 2013, DCS received further reports of neglect. The report stated that D.C. had physically assaulted Mother in front of Children, D.C. had gouged A.H.'s forehead with a fingernail causing a mark, there were about eighteen to twenty cats in Parents' home, and there was cat urine and feces throughout the home. The next day, DCS interviewed Children at school and thereafter removed them from Parents' home. On January 8, 2013, DCS filed a petition alleging that A.H. and W.H. were children in need of services (CHINS) since: Parents had not complied with the informal adjustment requiring them to attend parenting classes and other sessions; D.C. had physically abused Mother in front of Children; Parents' home was unsanitary; Parents continued to have Aunt, Cousin, and D.C. live in their home; D.C. had touched A.H.'s "penis when everyone was in bed"; and D.C. had physically assaulted A.H. (Petitioner's Ex. H).

[6] An initial detention hearing was held on January 22, 2013, and Parents denied the allegations in the CHINS petition. On April 16, 2013, the trial court held a fact finding hearing where it found Children to be CHINS. At the dispositional hearing on May 14, 2013, the trial court decided that Children should remain in their current placement, and ordered therapy for Children. Also, the trial court

required Parents to maintain consistent contact with DCS, visit Children, complete a domestic violence program, allow unannounced DCS visits, keep all appointments with DCS, maintain suitable housing, complete parenting classes, have no contact with D.C., and complete psychological evaluations.

[7] The progress report dated June 19, 2013 indicated that Father had attended his Homemaker Service sessions but he had missed a session of Fatherhood Engagement due to illness. Mother had completed a six-week parenting class, had begun attending a sixteen-week course for Building Healthy Relationships, had met weekly with the case manager, and had met monthly with her therapist. Despite Parents' cooperation, the trial court found that the Parents' home did not have running water in the bathroom, the kitchen plumbing was not well connected, the home was in disarray, and Aunt and Cousin continued to reside in Parents' home. Based on that, the trial court continued placement of Children with DCS, and ordered Parents to continue with court ordered services.

[8] Following the periodic review hearing on July 2, 2013, the trial court found that Mother was compliant with the service providers, but Father had been unable to participate in some of the programs and services offered by DCS. In the progress report dated December 11, 2013, Children were doing well in foster care. Also, the report indicated that Mother had attended all thirty-five supervised visits; however, Mother had displayed poor hygiene during the visits, and had become frustrated when Children got out of control. As for Father, out of the thirty-five supervised visits, he had attended nineteen. Father

often displayed inappropriate behavior during the visits—passing gas, belittling Mother in front of Children, talking on his cell phone, and favoring one of the Children. Following a permanency hearing on December 17, 2013, the trial court found that Mother was compliant with the services but Father was not. The trial court continued placement of Children with DCS and ordered Parents to continue with the services.

[9] On March 18, 2014, when FCM Sheri Krider (FCM Krider) visited Parents' home, Mother did not offer her access to the home, and Mother spoke to her on the front porch. Mother displayed a "black eye, a very large gash . . . over her right eye. She had a Band-Aid over it. The cut was all red and swollen." (Tr. p. 21). FCM Krider requested Mother to pull back the Band-Aid and she observed the cut to be fairly deep. FCM Krider questioned Mother if she needed medical care but Mother declined the offer. FCM Krider reported the incident to the police who, in turn, visited Mother's home and took pictures of Mother's injuries. Later that day, FCM Krider again visited Mother's home. This time, Mother allowed her to enter. FCM Krider took pictures of the Parents' home. The only improvement FCM Krider noted was that there were fewer cockroaches; however, there was no running hot water in the bathroom, a mattress in Children's room was covered in cat urine and feces, there were multiple electrical cords lying all over the floor, the floors were dirty, there was trash and clutter all over the house, and there were tools and ladders on the front porch. In May 2014, FCM Krider returned to Parents' home for another visit. However, she was not allowed to enter the home.

[10] At a June 2014 session, therapist Anastasia Godsey (Therapist Godsey) questioned Father about Mother's bruises. Father indicated that the bruises were due to other reasons and it was not Therapist Godsey's business as to what occurred in the bedroom. From March to July 2014, FCM Krider continued to observe cuts and bruises on Mother.

[11] The progress report dated June 16, 2014, indicated that Parents still struggled with the visits. Mother had attended most of the visits, but Father continued to miss out on some. On June 23, 2014, DCS filed a petition to terminate Parents' parental rights. However, DCS continued to help Parents fulfill their court-ordered services. On December 16, 2014, the trial court held a permanency hearing and found that Father was not in compliance but Mother was participating in the services. The trial court also noted that Parents were visiting Children, albeit irregularly.

[12] A bifurcated fact-finding termination hearing was held on March 16 and 17, 2015. The hearing was ultimately concluded on April 9, 2015. On April 24, 2015, the trial court issued its Order terminating Parents' rights. The trial court found, in relevant part,

> Termination is in the best interest of the minor children. The Court finds that the [C]hildren need a safe and sanitary home that is free of domestic violence and the presence of persons who endanger their physical safety. After three years of DCS involvement with [the Parents], there is no indication that they are able to provide . . . for their [C]hildren. At the time the [C]hildren lived in their home with their parents, their hygiene was consistently very poor and they missed many of their doctor

appointments. Since their removal, their hygiene has been good and they no longer miss doctor appointments. As a result, their diabetes is under control. At the beginning of the foster placement the [C]hildren's behavior was very challenging for their foster mother, but the CASA has observed a significant improvement in their behavior and demeanor over the past two years. . . . Virtually none of the negative conditions that existed at the home at the time of the removal are present in the [C]hildren's lives today.

(Appellants' App. p. 16).

[13] Parents now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[14] In reviewing the termination of a parent's rights, it is a long-settled tenet of this court that the trial court is entitled to considerable deference. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). Our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Rather, we will consider only the evidence and any inferences reasonably derived therefrom that are most favorable to the trial court's judgment. *Id.* In addition, Indiana Code section 31-37-14-2 requires that a finding in a termination proceeding "be based upon clear and convincing evidence." Accordingly, in reviewing whether the trial court's findings or judgment are clearly erroneous, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and

convincingly support the judgment." *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).

[15] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. Of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S., 717 N.E.2d 204, 208* (Ind. Ct. App. 1999), *trans. denied.*

## II. *Termination of Parental Rights*

[16] The traditional right of parents to direct the care, custody, and control of their "children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d at 1259 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution prevents the State from unduly interfering with parents' decisions regarding the upbringing of their children. *In re: C.A.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014). However, parental rights are not absolute; in fact, they are "subordinate . . . to the children's interests when the children's emotional and physical development is threatened." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*.

[17] A court may terminate parental rights "when parties are unable or unwilling to meet their responsibility as parents." *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Because the termination of parental rights permanently severs the parent-child relationship, it is an extreme sanction that "is intended as a last resort, available only when all other reasonable efforts have failed." *C.A.*, 15 N.E.3d at 92. The purpose of termination is to protect the children, not to punish the parents. *Lang*, 861 N.E.2d at 371. In such cases, Indiana law stipulates that DCS must establish, in part,

> (A) that one (1) of the following is true:
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * * *
> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each statutory element by clear and convincing evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014).

## A. *Reasonable Probability That Conditions Will Not Be Remedied*[1]

[18] Parents contend that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal and placement in foster care will not be remedied.

[19] In making this determination, a trial court should assess the "parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. This entails an evaluation of "the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. The trial court "may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment[,]" as well as the parent's response to any services offered by DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[20] We note that subsection (b)(2)(B)(i) of the termination statute requires that DCS must establish a reasonable probability that "the conditions that resulted in the child's removal or *the reasons for placement outside the home of the parents will not be*

---

[1] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Indiana Code Section 31-35–2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Children outside the home will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

*remedied*." I.C. § 31-35-2-4(b)(2)(B)(i) (emphasis added). "This language clarifies that it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.,* 825 N.E.2d at 806.

[21] Initially, DCS intervened and removed Children after receiving reports of neglect. One of the issues was that Parents' home was unsafe and unsanitary. Here, the record is replete with evidence that Parents did not alleviate the conditions of their home during the entire CHINS case. By the time DCS filed the termination petition, Children had been removed from Parents' care for about one and one-half years. The trial court found, in relevant part,

> 8. The Petition for Involuntary Termination of Parental Rights was filed on June 23, 2014. Another permanency hearing was held on December 16, 2014, by which time the permanency plan was adoption with a concurrent plan of reunification with [P]arents. On March 18, 2014, the last date DCS was allowed to access the [Parents'] home, there were fewer cockroaches in the home and [Father] had succeeded in getting at least cold water running to the bathroom. The floor was still unsafe and there was cat feces all over a bedroom. In the back of the kitchen there was a fire hazard with electrical cords and debris everywhere. The master bedroom was cluttered as was the front foyer, porch and hallway. There was a broken window on the door. There was a bowl with cat food on the floor of the kitchen. The bathroom toilet and area around the toilet were filthy. There was cat feces on beds in the home. In short, the conditions of the home was still not suitable for human habitation, particularly for young children. DCS case managers returned to the home for the final time in May 2014, but were denied access to the home.

> When DCS returned to the home in November 2014, [Father] said he would let the FCM in the home after he had replaced the water heater, but he never contacted DCS to let them know whether that was accomplished. The CASA was allowed in the home in June 2014, at which time the above-described conditions, including the unrepaired bathroom floor remained. The walls and the floor were extremely unclean and the CASA counted five cat boxes full of feces.

(Appellant's App. p. 14). We note that "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Moreover, as stated above, the trial court is not required to "wait until a child is irreversibly harmed such that his or her physical, mental, and social development are permanently impaired." *In re A.D.W.*, 907 N.E.2d 533, 540 (Ind. Ct. App. 2008). FCM Krider testified that (1) there was no substantial improvement in the Parent's home, (2) Father had failed to engage in all the services, and (3) there was still issues with the visitations. FCM Krider was also concerned with Father's temper, and she noted that it has never been established as to how Mother "continues to be injured." (Tr. p. 44).

[22] Parents do not challenge DCS's evidence, the material and significant factual findings made by the trial court, or the court's reliance on those findings in its conclusions. Rather, they simply assert that this court should credit evidence they deem favorable to themselves rather than the evidence relied on by the trial

court. But we will not reweigh the evidence on appeal. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.*

[23] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions resulting in the Children's removal and continued placement outside the Parents' care will not be remedied.

### B. *Best Interests*

[24] In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re A.F.*, 762 N.E.2d 1244 at 1253 (Ind. Ct. App. 2002), *trans. denied*. In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id*. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. *In re A.D.S.*, 987 N.E.2d 1150, 1158–59 (Ind. Ct. App. 2013), *trans. denied*.

[25] Parents argue that we should reconsider the trial court's conclusion that terminating their parental rights was in Children's best interests. Specifically, Parents argue that Children indicated that they wanted to come home. The Parents do not cite to the record or any legal authority. It is well-settled that we

will not consider an appellant's assertion on appeal when he or she has not presented a cogent argument supported by authority and references to the record as required by the rules. *Thacker v. Wentzel*, 797 N.E.2d 342, 345 (Ind. Ct. App. 2003); Ind. App. Rule 46(A)(8)(a).

[26] Additionally, "'[w]e will not become an advocate for a party nor will we address argument[s] which are either inappropriate [or], too poorly developed or improperly expressed to be understood.'" *Thacker*, 797 N.E.2d at 345 (quoting *Ramsey v. Review Bd. of Ind. Dep't of Workforce Dev.*, 789 N.E.2d 486, 486 (Ind. Ct. App. 2003)). Therefore, to the extent Parents challenge Children's best interests, we find that they have waived their claim on appeal by failing to support it with a cogent argument.

[27] Waiver notwithstanding, we note that in a report dated February 18, 2015, CASA Charlotte Barker (CASA Barker) stated that Children had shown signs of attachment to their foster mother. A.H. stated that he missed his "mom and dad and is glad that he gets to visit them regularly. However, when questioned, he says he liked living in his foster home because he gets to do lots of things that he wouldn't do at home. He enjoys playing outdoors and riding his bike." (Petitioner's Ex. L.). As for W.H., CASA Barker stated that W.H. indicated that he loved living with his foster mom, and he did not wish to return to Parents' home.

[28] In addition, at the fact-finding termination hearing, CASA Barker stated that when Children were at first placed in foster care, their behavior was challenging

for their foster mother. However, she indicated that Children had displayed a significant improvement in their behavior and demeanor over the past two years. Specifically, she testified that Children seem to be "calm, and just better behaved overall." (Tr. p. 61). When asked whether it was in Children's best interest for Parents' rights to be terminated, CASA Barker stated "I see in their current placement they have discipline. They have structure. They have access to activities. They have help with their homework. They're expected to do [] their homework. [W.H.] in particular has [] done really well in school. He's been on the honor roll multiple times. He's won the mayor's award at one point." (Tr. p. 61). Here, we find that clear and convincing evidence supports the trial court's determination that termination of parental rights serves Children's best interests.

## CONCLUSION

[29] Based on the foregoing, we conclude that there was clear and convincing evidence to support the termination of Parents' parental rights.

[30] Affirmed.

[31] Najam, J. and May, J. concur